Argued and submitted July 20, affirmed August 31,
reconsideration denied October 15,
petition for review denied November 17, 1981 (292 Or 108)

ROACH,
*Appellant,*

*v.*

HOCKEY et al,
*Respondents.*

(No. 78-1828, CA 18574)

634 P2d 249

W. Wallace Ogdahl, Salem, argued the cause for appellant. On the brief were Roger C. Pearson and Ferder, Ogdahl & Souther, Salem.

Randall Bryson, Eugene, argued the cause for respondents. With him on the brief were Calkins & Calkins, and Bryson & Bryson, Eugene.

Before Gillette, Presiding Judge, and Roberts and Young, Judges.

GILLETTE, P. J.

## GILLETTE, P. J.

This is an action for medical malpractice. Plaintiff alleged that defendants, physicians and surgeons,[1] were negligent in their treatment of him. Specifically, plaintiff alleged that defendants failed to exercise the necessary degree of skill and care during an operation to remove a herniated disc from his upper spine and that as a result he suffered paralysis in his arms and hands. The case was tried to a jury and a verdict was returned for defendants. Plaintiff appeals, assigning as error the giving of certain jury instructions, the failure to give certain others and a number of evidentiary matters. We affirm.

Plaintiff suffered from a large herniated disc located in the neck area. On March 23, 1976, defendant Hockey performed a laminectomy to remove the disc. Immediately after the operation plaintiff could not move his hands and had only slight control over his arms. This condition has continued to this date with only minimal improvement.

In his complaint plaintiff alleged that the damage to his spinal cord, and, thus, his paralysis, was due to the position in which he was placed during the operation. It was plaintiff's theory that, during the course of the operation, he was placed in a position of such extreme forward flexion that undue pressure from either the osteophytic ridges or the herniated disc was placed upon the spinal cord and its arteries, causing interference with the blood supply to the motor horn cells in the area. This lack of blood resulted in damage to these cells and caused plaintiff's paralysis.

In support of his theory, plaintiff offered the opinion of a Dr. Harris and an x-ray taken during the operation. Dr. Harris testified that a patient must be flexed forward during a laminectomy. However, because of concern with paralysis and keeping the patient's air passage free, the surgeon performing the operation must be cautious when angling the patient or positioning his head and neck forward. In Dr. Harris's opinion, the intra-operative x-ray

---

[1] Defendant Hockey performed the operation on plaintiff. He and the other named defendants are stockholders in a professional corporation.

showed that plaintiff was placed in a position of excessive flexion. This resulted in interference with the blood supply to the arteries in the area for a period of time sufficient to cause damage to plaintiff's nerve cells.

Defendants' witness, Dr. Paxton, disputed plaintiff's contentions. In his opinion the intra-operative x-ray was taken from an unusual angle and did not depict the degree of angulation with certainty. Reviewing the x-rays in the case, he concluded that plaintiff's neck was correctly flexed forward during the operation and that there was no evidence of excessive flexion. He agreed that plaintiff's paralysis was due to vascular impairment. However, according to Dr. Paxton, this interference was not due to the pressure of extreme flexion but rather to an anatomical variation of arteries in the damaged area.[2]

In their answer, defendants not only denied plaintiff's claim of negligence, but claimed further that plaintiff's condition resulted from an automobile accident and that plaintiff had signed a release of all claims arising from injury due to that accident. A copy of the release, dated June 21, 1976, was introduced into evidence. It states that the plaintiff releases "State Farm Insurance Company and Lynn Lindstrom * * * and all other persons, firms or corporations liable or who might be claimed to be liable * * * on account of all injuries, known or unknown which resulted from an automobile accident occurring on * * *." State Farm was the insurance carrier and Lindstrom the driver in the automobile accident. At trial plaintiff contended that the release applied only to the named person and not to the defendants in this case.

We will discuss first those claims of error relating to the instruction of the jury. Plaintiff's initial contention is that the trial court erred in instructing the jury that an honest error in judgment or an action in good faith would not be negligence. Plaintiff contends that the jury should have been instructed that a doctor is exempt from liability for an error of judgment only when there is a reasonable

---

[2] An understanding of the exact nature of this anatomical variation is not necessary to this appeal. Given the limited record before us and the complicated issues involved, our presentation of the witnesses' theories is somewhat simplified.

doubt as to the nature of the physical condition involved or as to the proper course to be followed. He argues that the failure to give this additional qualifying instruction amounted to telling the jury that a physician is not liable for an inappropriate judgment if he acts in good faith.

Plaintiff correctly states the law, but only in part. In *Moulton v. Huckleberry,* 150 Or 538, 546-547, 46 P2d 589 (1935), the court stated the rule as follows:

"It has sometimes been broadly held that a physician or surgeon is not liable for an honest error or mistake in judgment. Nevertheless a limitation of this broad rule is recognized in cases that exempt from liability for errors of judgment only where there is a reasonable doubt as to the nature of the physical condition involved or as to the proper course to be followed, or where good judgments may differ. Also another limitation of the broad rule stated is found in cases that hold that a qualified physician is not liable for an error of judgment if he applies ordinary and reasonable skill and care."

In *King v. Ditto,* 142 Or 207, 217, 19 P2d 1100 (1933), the court stated that

"* * * a physician and surgeon is not liable for error of judgment if the same is consistent with the exercise of reasonable care and diligence * * *. To avoid liability, the judgment must be based upon the exercise of reasonable care and skill."

And, in *Malila v. Meacham,* 187 Or 330, 354, 211 P2d 747 (1949), the court stated:

"It is well settled that a physician or dentist is not a warrantor of cures * * * and that, if a regularly licensed physician or dentist with reasonable diligence employs the skill of which he is possessed in treating a surgical case, he is not liable for an error of judgment." (Citations omitted.)

*See also, Eckleberry v. Kaiser Foundation, et al,* 226 Or 616, 626-627, 359 P2d 1090 (1961); *Williard v. Hutson,* 234 Or 148, 160, 378 P2d 966 (1963). From the above cases, it is clear that a physician is not liable for an error of judgment where there is a reasonable doubt or a difference of opinion as to the nature of the patient's condition or the proper course of treatment and the physician acts with reasonable care and skill in exercising that judgment.

■ In examining plaintiff's claim of error, we consider the jury instructions as a whole. *Hansen v. Bussman,* 274 Or 757, 781, 549 P2d 1265 (1976); *Horn v. City of Elgin,* 28 Or App 545, 550, 559 P2d 1319, *rev den* 278 Or 157 (1977). In this case the trial court instructed the jury that, in determining whether Hockey was negligent in the care and treatment of plaintiff, it was to determine if Hockey used the degree of skill, care and diligence which the ordinary, prudent, skillful physician engaged in the practice of neurosurgery in the same or a similar community would have used. The court then went on to state that:

> "If you believe from the evidence in this case that competent neurosurgeons in the same or similar communities as the defendants might have differed with Dr. Hockey in their judgment of the proper position of the plaintiff during the operating procedures but if the defendant in good faith and in the exercise of reasonable care erred in such judgment, then he would not be negligent."

This was a complete and correct statement of the law. There was no error.

■ Plaintiff's second contention is closely related to his first. He claims that the trial court erred in instructing the jury "that a doctor is not a guarantor of the results of his care and treatment of the patient." The law in Oregon is that a physician is not a warrantor of cures. *See Eckleberry v. Kaiser Foundation, et al, supra,* 226 Or at 626; *Malila v. Meacham, supra,* 187 Or at 354. Plaintiff acknowledges this state of the law but contends that the instructions given imply that a physician does not guarantee a reasonable course of treatment. We disagree. The instructions only state that a doctor does not guarantee the *results* of his treatment. The instructions do not imply that a doctor does not guarantee the quality of his care. In fact, they expressly state and re-state the requirement that a doctor utilize the accepted and ordinary level of skill and care expected of a doctor in his position. Viewing the instructions in their entirety, the jury could not have been misled.

■ The next instruction challenged by plaintiff concerns the release signed by plaintiff. The trial court instructed the jury as follows:

> "A release is an agreement in which a person agrees to release another person, firm or corporation from any liability either actual or potential to him, in exchange for a sum

of money. If you find that W. Larry Roach signed a release and ever intended that that release apply to all other persons, firms or corporations for injuries claimed in this case, then your verdict will be for the defendant. If you find that W. Larry Roach did not intend to release all other persons, firms or corporations, for injuries claimed in this case then you may not consider the release or its terms when deciding the other issues in this case."

Plaintiff claims that the court, in effect, told the jury that the issue regarding the release was whether or not plaintiff had executed one and, that if they found that he had, then the release applied to all parties. Once again plaintiff mischaracterizes the instructions. The trial court, consistent with the evidence presented,[3] stated that there were two issues, i.e., whether or not the plaintiff signed the release and whether or not the release was intended to apply to these defendants. The error claimed by plaintiff simply does not exist.

■ Plaintiff's next contention is that the trial court erred in refusing to instruct the jury that it should disregard the liability of any other potential defendants not a party to this action in assessing the liability of the present defendants and in computing the damages awarded to plaintiff. Plaintiff relies on this court's opinion in *Yardley v. Rucker Brothers Trucking, Inc.,* 42 Or App 239, 600 P2d 485 (1979), *rev den* 288 Or 335 (1980). In *Yardley,* we held that where a plaintiff settles with some, but not all, of the defendants in a case and subsequently brings suit against the remaining defendants, it is for the court and not the jury to perform the settlement credit function. Consistent with this rule, we concluded that either

> "* * * (1) evidence is not admissible about the existence or amount of the settlement; or (2) in appropriate circumstances evidence of the existence of the settlement can be admitted * * * provided that the court then instructs the jury in unequivocal language to disregard the settlement and return a verdict for the full amount of the plaintiff's damages." 42 Or App at 243.

---

[3] Plaintiff testified that he could not remember signing the particular document and that the release was not intended to discharge Hockey. The relevance of the release appears to us to be doubtful, but plaintiff has not assigned error to its admission on relevance grounds, assuming such an objection was made.

Plaintiff argues that, in light of *Yardley,* the trial court erred in not instructing the jury to disregard the release when returning their verdict.

Defendants offered the release in evidence, not for the purpose of revealing the amount of the settlement, but to support their claim that the plaintiff had released them from any liability for damages. The trial court clearly instructed the jury to disregard the release and its terms if it found that it did not apply to the present defendants. The jury was told to assess the liability of the present defendants and any damages without regard to the release, if it found that the release was not intended to apply to defendants. Therefore, the only issue the jury was asked to decide was whether or not the release prevented the present claim. Under these circumstances we find no conflict between the requirements set forth in *Yardley* and the procedures followed in this case.[4]

Plaintiff next claims that the trial court erred in instructing the jury that damages are not subject to income taxes. This is a correct statement of the law.[5] Assuming *arguendo* that it was error, we find no prejudice to the plaintiff. The jury found that the defendants were not liable and, therefore, did not consider the issue or amount of damages.

Plaintiff's final contention with respect to the jury instructions is that the trial court erred in not giving the following requested instruction:

"I instruct you that a finding cannot be based upon evidence which is opposed to established physical facts."

Plaintiff claims that the instruction should have been given because, consistent with his theory of the case, the intra-operative x-ray established the fact that plaintiff was placed in a position of excessive flexion during the operation. As discussed above, this fact was not established. The

---

[4] We said in *Yardley v. Rucker Brothers Trucking, Inc., supra,* 42 Or App at 243, that the jury should be told to disregard the settlement in assessing *damages.*

[5] *See Salsgiver v. E. S. Ritter Co.,* 42 Or App 547, 500, 600 P2d 951 (1979), *rev den* 288 Or 173 (1980), where we held that it was not error to refuse to instruct the jury that damages are not subject to taxes.

experts who testified differed in their assessment of both the accuracy of the x-ray and whether or not it demonstrated a position of excessive flexion. The trial court correctly declined to give the requested instruction.

■ We turn now to an examination of plaintiff's evidentiary claims. Plaintiff contends that the trial court erred in admitting a copy of the release into evidence. The copy is a Xerox copy and is dated June 21, 1976. It bears copies of the signature of the plaintiff, his then wife and, as a notary, the signature of his attorney at the time. Plaintiff objected to this evidence on the ground that it was hearsay, not properly authenticated, and not the best evidence. On appeal plaintiff contends that, because there were genuine questions as to the authenticity of the release, a copy, as opposed to the original, was not admissible without a showing that the original could not, with due diligence, be produced.[6] *See* ORS 541.640(1)(b).

At trial plaintiff testified that, although he remembered the process of settling his claim arising out of the automobile accident, he could not remember signing the particular document in question. He testified that the signature looked to be his, but he was not sure. However, prior to trial, plaintiff had moved for summary judgment. In support of his motion, he submitted an affidavit which stated that, on June 21, 1976, he and his wife executed a release in favor of State Farm Insurance Company and Lynn Lindstrom intending to release only those parties and not Dr. Hockey. In response to questioning by counsel plaintiff admitted the truth of this affidavit and, thus, the fact that he executed a release on June 21, 1976.

The attorney who represented plaintiff in his dealing with Lynn Lindstrom and State Farm testified that he signed the release as a notary. At the time of trial he did not have an independent recollection relating to the actual signing, but recalled that a release was executed and that it

---

[6] On appeal, plaintiff also contends that, given our opinion in *Yardley v. Rucker Brothers Trucking, Inc., supra,* the evidence of the release agreement, involving the liability of other potential defendants was highly questionable. Plaintiff did not raise this contention below. In any event, as discussed above, the release was admitted to determine its effect and not as a device to assess the amount of damages for which defendant should be held liable.

was intended to release State Farm and Lynn Linstrom only. He testified that, if he attested to plaintiff's signature on the release, then plaintiff must have signed it.

In *State v. White,* 4 Or App 151, 156, 477 P2d 917 (1970), we stated that, "* * * the purpose of the best evidence rule is to secure the most reliable information as to the content of documents when those contents are disputed." We concluded that, where the accuracy of a Xerox copy was not challenged, the reason for the best evidence rule was not present and the copy was admissible evidence. We stated:

> "[i]f, however, there is no good faith dispute, as here, over the accuracy of the document presented, the 'mystical ideal of seeking "the best evidence" or the "original document"' will not be pursued." 4 Or App at 156.

*See also, Dean Vincent, Inc. v. Stearns,* 276 Or 533, 537, 555 P2d 448 (1976); *State v. Partee,* 32 Or App 117, 121, 573 P2d 751, *rev den* 282 Or 385 (1978).

In this case, like those noted above, the purpose of the best evidence rule is not present, and the copy of the release was properly admitted. Plaintiff challenged only the effect of the release. He did not contend that a release had not been executed or that the copy produced at trial was not accurate. In fact, he admitted signing a release on the date in question.

■ Plaintiff's final contention is that the trial court erred in admitting into evidence a letter from defendants' expert witness, Dr. Paxton, to defendants' attorney. In the letter Dr. Paxton describes Dr. Harris' view, explores why he disagrees with it and offers his opinion about the cause of plaintiff's condition. The letter was introduced into evidence after the following exchange took place between plaintiff's attorney and Dr. Paxton during cross-examination:

> "Q. Dr. Paxton, isn't [sic] your feelings about what may or may not have happened, aren't they basically pure speculation?
>
> "A. Well, I think speculation is a very bad word, they are my considered opinion.
>
> "Q. I would ask you if you would, please, to read the last portion of your letter to me of September 18, 1978,

where you say, 'But I must point out this is—' this is at the bottom of the second to the last paragraph.

"\* \* \* \* \*

"A. 'But I must point that almost all of this is speculation and I have no absolute information about what went on at the operative procedure, nor do I know the cause of this man's present condition.'"

The letter to defendants' attorneys was thereafter offered by defendant and admitted as a prior consistent statement.

Plaintiff contends that the letter is inadmissible because it is repetitive and redundant, because it is hearsay, and because it is secondary evidence introduced after primary evidence, *i.e.,* Dr. Paxton's oral testimony. Plaintiff's objections might be well taken if the letter was used as substantive evidence of Dr. Paxton's opinion.[7] However, it was not. It was offered only after plaintiff's attorney had attempted to impeach Dr. Paxton's testimony.

Dr. Paxton testified that his explanation of plaintiff's condition was his considered opinion. The portion of the letter to plaintiff's attorney read at trial suggested that Dr. Paxton's opinion was, in fact, speculation and that he did not know the cause of plaintiff's condition. As such, this letter was a prior inconsistent statement. The second letter, the one in question here, is a prior consistent statement. It was offered not as evidence of Dr. Paxton's opinion or for the truth of the matter contained therein, but to show that Dr. Paxton had a considered opinion of plaintiff's condition all along and did not fabricate one for trial.

In *Cook v. Safeway Stores, Inc.,* 266 Or 77, 511 P2d 375 (1973), the court discussed the use of prior consistent statements:

" 'There is much division of opinion on the question whether impeachment by inconsistent statements opens the door to support by proving consistent statements. A few courts hold generally that the support is permissible. This rule has the merit of easy application in the court room. Most courts, since the inconsistency remains despite all consistent statements, hold generally that it does not.

---

[7] *See Scanlon v. Hartman,* 282 Or 505, 509, 579 P2d 851 (1978), on the use of secondary evidence as opposed to primary evidence.

But certain exceptions should be recognized. If the attacked witness denies the making of the inconsistent statement then some courts consider that the evidence of consistent statements near the time of the alleged inconsistent one, is relevant to fortify his denial. Again, if in the particular situation, the attack by inconsistent statement is accompanied by, or interpretable as, a charge of a plan or contrivance to give false testimony, then proof of a prior consistent statement *before* the plan or contrivance was formed, tends strongly to disprove that the testimony was the result of contrivance. Here all courts agree. It is for the judge to decide whether the impeachment amounts to a charge of contrivance — ordinarily this is the most obvious implication — and it seems he is entitled to have an avowal one way or another from counsel. If it does not, then it may often amount to an imputation of inaccurate memory. If so the consistent statement made when the event was recent and memory fresh should be received in support. Recognition of these exceptions would leave it still open to these courts to exclude most statements procured after the inconsistent statement, and thus to discourage pressure on witnesses to furnish successive counter-statements.'" 266 Or at 87-88, quoting from McCormick, Evidence 106, § 49 (2d ed 1972).

In that case the court concluded that the admission into evidence of a prior consistent statement was proper where the defendants' attack on the credibility of plaintiff's witness by use of a prior inconsistent statement "* * * was that defendants were contending either that the witness was giving recently contrived testimony or he had a failing memory, or both." 266 Or at 88.

We conclude that the admission of Dr. Paxton's letter as a prior consistent statement was proper. It tended to prove that Dr. Paxton's opinion was neither the product of a faulty memory nor recently contrived.

Affirmed.